UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CV-60191-RAR

**QUASH SELTZER, LLC**,

    Plaintiff,

v.

**PEPSICO, INC.**,

    Defendant.

_____/

**ORDER GRANTING MOTION TO STAY**

**THIS CAUSE** comes before the Court upon Defendant PepsiCo, Inc.'s Motion to Stay [ECF Nos. 12 and 17-1] ("Motion"), which seeks a stay of this action pending the outcome of an arbitration between Defendant and a company closely related to Plaintiff. Having reviewed the Motion, Plaintiff's Response [ECF Nos. 27, 29], Defendant's Reply [ECF Nos. 32, 33], the record, applicable law, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion is **GRANTED** as set forth herein.

**BACKGROUND**

At issue in this case is who owns the rights to distribute an alcoholic beverage named MIXX™ Hard Seltzer ("MIXX"). While Quash Seltzer, LLC ("Quash") is the named Plaintiff, this suit is but the latest chapter in a multifaceted dispute between PepsiCo, Inc. ("Pepsi") and Vital Pharmaceuticals ("VPX")—a company closely related to Plaintiff. *See generally Vital Pharm. v. PepsiCo, Inc.*, No. 20-62415, 2021 WL 1022839, at *1-2 (S.D. Fla. Mar. 16, 2021) ("VPX Litigation") (describing the Pepsi-VPX feud in detail). Because the instant Motion asks

the Court to stay this case pending a proceeding in that dispute, the Court must take a comprehensive look at the status of the parties' overall legal battle.

### i. *The Parties and Their Legal Relationships*

In March 2020, well-known beverage conglomerate Pepsi entered into a distribution agreement with beverage manufacturer VPX whereby Pepsi agreed to become the exclusive distributor for certain VPX products. *See* First Am. Compl. [ECF No. 9] ¶ 3; Mot., Ex. A [ECF No. 17-2] ("Distribution Agreement" or "Agreement") § 1.1. As relevant here, the VPX products to be distributed by Pepsi include beverages packaged under the "Bang" trademark. Distribution Agreement at 5, 29. The scope of which products fall under "'Bang' trademarked beverages" lies at the center of this case.

Plaintiff Quash was chartered in August 2020 as part of plans for the marketing and sale of MIXX, which is the first beverage line that Quash has ever produced for distribution. Resp., Ex. A ("Bukovi Decl.") ¶ 5. Quash shares common ownership, executives, counsel, and administrative and operational personnel with VPX. *Id.* ¶ 6; First Am. Compl. ¶¶ 3, 16. According to Quash, it manufactures alcohol-based products, whereas VPX manufactures non-alcohol performance beverages and sports nutrition products, and the two companies have at all times observed all corporate formalities necessary to maintain separate and distinct existences. Bukovi Decl. ¶ 6. Quash is not a party to the Distribution Agreement nor any other agreement with Pepsi. *Id.* ¶ 8.

Quash does not dispute (nor could it, based on a simple glance at a MIXX can) that MIXX is packaged under the "Bang" trademark. Therefore, Pepsi believes that it possesses the rights to MIXX under the Distribution Agreement. *See* Mot. at 4. But Quash argues that the Distribution Agreement was not intended to encompass *alcoholic* beverages, and therefore Quash has the right

to manufacture and distribute MIXX free and clear of any of Pepsi's rights under the Distribution Agreement.

### ii.    The Pepsi-VPX Dispute

The last time Pepsi and VPX appear to have agreed on anything was when they signed the Distribution Agreement in March 2020. Soon after, VPX became dissatisfied with Pepsi's distribution performance and elected to terminate the contract without cause on October 23, 2020. First Am. Compl. ¶¶ 4-5. Pepsi then initiated arbitration proceedings before the American Arbitration Association ("AAA") against VPX on November 23, 2020, under the Distribution Agreement's binding arbitration clause. *See generally PepsiCo, Inc. v. Vital Pharmaceuticals, Inc.*, American Arbitration Association No. 01-20-0015-8060; *see also* Mot. for Confirmation of Arb. Award, Ex. A at 2, VPX Litigation [ECF No. 14-1] ("Interim Arbitration Order"). While VPX took the position that the Distribution Agreement was terminated upon giving notice of termination, Pepsi countered that the Agreement's provisions mandated that it remain in full force and effect for three years after giving notice. Interim Arb. Order at 2, 12-14. Pepsi therefore sought emergency interim relief from the AAA, seeking to maintain the status quo pending arbitration and to remain the exclusive distributor of Bang-branded products until the Distribution Agreement is terminated. *Id*. at 2.

On November 25, 2020, after Pepsi filed its AAA arbitration demand and sought emergency relief, VPX filed suit in this Court—indeed, before the undersigned—arguing that Pepsi breached the Distribution Agreement and tortiously interfered with VPX's business relationships by holding itself out as the exclusive distributor of the products delineated in the Distribution Agreement. *See generally* Compl., VPX Litigation [ECF No. 1]. VPX sought to enjoin Pepsi from claiming to be the exclusive distributor of Bang-branded products.

On December 7, 2020, the Emergency Arbitrator issued the Interim Arbitration Order, finding that based on the unambiguous terms of the Distribution Agreement, Pepsi is "likely entitled to the relief that it seeks in this Arbitration, namely, a declaration that [Pepsi] remains [VPX's] exclusive distributor pursuant to the [Agreement] through October 24, 2023." Interim Arb. Order at 9. To maintain the status quo pending arbitration of the parties' dispute, the Emergency Arbitrator ordered VPX to abide by the terms of the Distribution Agreement and cease efforts to sell to customers for whom Pepsi has exclusive distribution rights. *Id.* at 21.

After this Court confirmed the Interim Arbitration Order, *Vital Pharm. v. PepsiCo, Inc.*, No. 20-62415, 2020 WL 7625226, at *4–5 (S.D. Fla. Dec. 21, 2020), the Court granted Pepsi's Motion to Dismiss VPX's Complaint in the VPX Litigation, 2021 WL 1022839, at *3-6. The Court held that VPX was collaterally estopped from challenging the Emergency Arbitrator's construction of the Distribution Agreement or the appropriate status quo to be enforced pending arbitration. *Id*.

The arbitration proceedings between Pepsi and VPX have now been underway for some time. On February 8, 2021 (two weeks after this lawsuit was filed), Pepsi filed an amended arbitration demand that sought to bring the central issue in this case—whether Quash may introduce MIXX to the market—within the arbitration panel's review. *See* Decl. of Suria M. Bahadue [ECF No. 17-2], Ex. B ("Amended Arbitration Demand"). Specifically, Pepsi alleges in the Amended Arbitration Demand that VPX is violating its rights under the Distribution Agreement by "developing plans to launch a Bang-branded hard seltzer, Bang Mixx Hard Seltzer," which "bears the Bang-branded trademark." *Id*. ¶ 60. Pepsi seeks a declaration that it "remain the exclusive distributor of Bang-branded products, including any new Bang-branded products introduced by VPX, until October 24, 2023." *Id*.

In addition, on February 12, 2021, Pepsi filed a motion for sanctions against VPX for alleged violations of the Distribution Agreement, Interim Arbitration Order, and Confirmation Order—including VPX's purportedly wrongful distribution of MIXX. *See generally* Decl. of Suria M. Bahadue [ECF No. 17-2], Ex. C ("Sanctions Mot."). The Sanctions Motion alleges that VPX has signed agreements with distributors other than Pepsi to distribute MIXX, and also presents evidence that (i) MIXX displays the Bang trademark on cans and packaging; (ii) the product is widely touted as Bang on VPX's social media platforms; (iii) MIXX looks nearly identical to other Bang-branded products; and (iv) VPX's CEO has announced on Instagram that MIXX is a Bang product. *Id*. at 8-12, 15-17.

A preliminary hearing was held in the arbitration proceedings on March 23, 2021, where the arbitration panel, after analyzing the parties' written proposals, "discussed with the Parties what claims and issues will be addressed during the Phase 1 and the Phase 2 hearings." Def.'s Notice of Supp. Auth. [ECF No. 35-1] at 1. The following day, the panel issued a procedural order, confirming that "[t]he Phase 1 hearing will result in a final partial award addressing . . . [w]hether the Bang Mixx hard seltzer product is a Licensed Product under the Distribution Agreement." *Id*. at 2.

### iii.   *The Present Lawsuit*

On January 26, 2021, Quash initiated this lawsuit, which alleges that Pepsi, intending to harm Quash, "and in an effort to gain leverage in the pending legal disputes between PepsiCo and VPX regarding the BANG® energy drinks, [] has threatened Quash's prospective distribution partners into not doing business with or even exploring a relationship with Quash relating to distribution of MIXX." First Am. Compl. ¶ 7. Quash claims that Pepsi has been "wrongly advising Quash's prospective distribution partners that PepsiCo has the exclusive right to distribute

the MIXX hard seltzer line of alcohol products, despite the fact that, among other things, it does not have any right to distribute those products." *Id*.

As mentioned above, Quash insists that the Distribution Agreement between Pepsi and VPX "does not cover, and was never intended to cover, the distribution of alcoholic or other intoxicating beverages." *Id*. ¶ 20. As evidence of this, Quash points to: (i) the fact that Pepsi does not distribute any alcoholic, intoxicating, or similarly-regulated beverages and is not licensed to do so in any jurisdiction; (ii) neither Quash nor MIXX existed at the time the Distribution Agreement was signed; and (iii) nearly seven months after the Distribution Agreement was signed, at which time Quash had been formed and the MIXX hard seltzer line had started development, Pepsi publicly stated it lacked a "partner" in the alcohol market. *Id*. ¶¶ 20-22.

Quash brings a claim for tortious interference with prospective business relationships and a claim for a declaratory judgment that Pepsi has no right to distribute MIXX under the Distribution Agreement. *Id*. at 7-9. Quash also seeks an order enjoining Pepsi from communicating to the public that it is the exclusive distributor of MIXX. *Id*. at 12.

Right out of the gate, the parties disagreed on how this case should proceed. On February 16, 2021, Quash filed an Expedited Motion for a Speedy Declaratory Judgment Hearing [ECF No. 10], seeking a hearing on its declaratory judgment claim within 45 days. On the same day, Pepsi filed the instant Motion to Stay this action in its entirety pending resolution of the ongoing arbitration between Pepsi and VPX—as well as an Expedited Motion to Extend the Responsive Pleading Deadline [ECF No. 14], which sought to extend the deadline to file a responsive pleading to one week after the Court rules on the Motion to Stay. The Court denied Quash's Expedited Motion without prejudice, explaining that "[b]ecause [Pepsi] ha[d] raised legitimate arguments in favor of staying this action, . . . [the] Motion to Stay should be adjudicated before consideration of [Quash's] claim for declaratory judgment." Omnibus Order [ECF No. 25] ¶ 1. For the same

reason, the Court granted Pepsi's Expedited Motion and extended the responsive pleading deadline to seven (7) days from the date of the Court's resolution of the Motion to Stay. *Id.* ¶ 2.

## LEGAL STANDARD

District courts possess "inherent, discretionary authority to issue stays in many circumstances." *Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc.*, 524 F.3d 1235, 1241 (11th Cir. 2008). One such circumstance is when related proceedings are pending before a different tribunal. *See Ortega Trujillo v. Conover & Co. Comm., Inc.*, 221 F.3d 1262, 1264 (11th Cir. 2000). When that related proceeding is an arbitration, it is not just the parties or claims committed to the arbitration that are within a court's discretion to stay. Instead, the Supreme Court has noted that "[i]n some cases . . . it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of its discretion to control its docket." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 21 n.23 (1983). "Crucial to this determination is whether arbitrable claims predominate or whether the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." *Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004); *see also OTR Wheel Eng'g, Inc. v. Camso USA Inc.*, No. 4:18-CV-00184, 2018 WL 8997490, at *4-5 (N.D. Ga. Oct. 25, 2018); *Moe's D&B, LLC v. Mama Fu's Noodle House, Inc.*, No. 06-22659, 2008 WL 11407189, at *1 (S.D. Fla. Jan. 8, 2008); *St. Paul Fire & Marine Ins. Co., Inc. v. La Firenza, LLC*, No. 8:06-CV-1855, 2007 WL 2010759, at *2-3 (M.D. Fla. July 6, 2007).

In these situations, courts have granted stays where a plaintiff's nonarbitrable claims are "commingled with facts and circumstances being litigated in the arbitration proceeding," such that awaiting the outcome of arbitration would serve judicial efficiency. *United States ex rel. Postel Erection Grp., L.L.C. v. Travelers Cas. & Ins. Co. of Am.*, No. 6:12-CV-182-ORL-37, 2012 WL 2505674, at *2 (M.D. Fla. June 28, 2012); *see also Chemence, Inc. v. Quinn*, No. 1:11-CV-01366-

RLV, 2012 WL 12873615, at *6 (N.D. Ga. Oct. 15, 2012) (staying a case pending arbitration because of "commingled . . . facts and circumstances," the "possibility of inconsistent outcomes," and a risk of "unnecessary expenses").

The burden of demonstrating the appropriateness of a stay is on the party seeking the stay. *See Postel Indus., Inc. v. Abrams Grp. Const., LLC*, No. 6:11-cv-1179-Orl-28DAB, 2013 WL 1881560, at *4 (M.D. Fla. Mar. 29, 2013) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)), *report and recommendation adopted*, 2013 WL 1881556 (M.D. Fla. May 3, 2013). The movant must demonstrate "hardship or inequity in being required to go forward, if there is a fair possibility that the stay will cause damages to someone else." *Id*.

The Eleventh Circuit has cautioned that "[w]hen a district court exercises its discretion to stay a case pending the resolution of related proceedings in another forum, the district court must limit properly the scope of the stay." *Trujillo*, 221 F.3d at 1264. Specifically, "a stay order which is 'immoderate' and involves a 'protracted and indefinite period' of delay is impermissible." *King v. Cessna Aircraft Co.*, 505 F.3d 1160, 1172 (11th Cir. 2007); *Trujillo*, 221 F.3d at 1264 ("In considering whether a stay is 'immoderate,' we examine both the scope of the stay (including its potential duration) and the reasons cited by the district court for the stay.").

## **ANALYSIS**

Despite all the twists and turns in the legal saga over the Distribution Agreement, the instant Motion presents a rather straightforward question: should this case—which asks the Court to decide whether Pepsi has the right to distribute MIXX—be stayed while a duly-appointed arbitration panel decides whether Pepsi has the right to distribute MIXX? Both precedent and common sense say yes.

Quash makes much of the fact that it is not a party to the Distribution Agreement and therefore has not contractually agreed to arbitrate its claims. *See* Resp. at 11-13. But that is beside

the point because Pepsi is not moving to *compel* arbitration of Quash's claims; instead, Pepsi seeks only a *stay* of Quash's claims pending the outcome of the arbitration. This is a material difference in terms of the Court's analysis. *See DaPuzzo v. Globalvest Mgmt. Co., L.P.*, 263 F. Supp. 2d 714, 740-41 (S.D.N.Y. 2003) ("[T]he exercise of jurisdiction to compel arbitration cannot be equated with that entailed in staying an action. The two judicial prerogatives are qualitatively different. . . . [U]nlike the statutory and contractual grounding that legitimate the power to compel arbitration, a court's authority to stay litigation has its own separate discretionary footing in judicial economy."); *see also Shanferoke Coal & Supply Corp. v. Westchester Serv. Corp.*, 293 U.S. 449, 453 (1935) ("[T]here is no reason to imply that the power to grant a stay is conditioned upon the existence of power to compel arbitration in accordance with . . . the [Federal Arbitration] [A]ct. . . .There is . . . strong reason for . . . permitting the federal court to order a stay even when it cannot compel the arbitration.").

While a party's status as a nonsignatory to an arbitration agreement would be relevant (though not necessarily dispositive[1]) in considering whether that party could be compelled to arbitrate its claims, a court's discretion to stay litigation pending related arbitration is not limited by a requirement that the litigating parties all be signatories to the relevant arbitration agreement. For example, in *Variable Annuity Life Insurance Co. v. Laferrera*, the Eleventh Circuit held that the district court abused its discretion by *declining* to stay an action pending a related arbitration and explained that the fact that a litigating party and an arbitrating party "are technically different . . . is of no practical importance" when the litigation and arbitration are "based on the exact same

---

[1] "State law provides the rule of decision on the question of whether an arbitration provision may be enforced against a nonparty." *Taylor Grp., Inc. v. Indus. Distrib. Int'l Co.*, --- F. Supp. 3d ---, 2020 WL 8678099, at *7 (S.D. Fla. Dec. 10, 2020). The Distribution Agreement is governed by New York Law, Agreement § 9.11(a), and the New York Court of Appeals "has recognized in certain limited circumstances the need to impute the intent to arbitrate to a nonsignatory." *TNS Holdings, Inc. v. MKI Sec. Corp.*, 703 N.E. 2d 749, 751 (1998).

factual allegations." 680 F. App'x 880, 884 (11th Cir. 2017).  The nonsignatory defendant's liability was "predicated" on the arbitrating parties' conduct, so "[p]ermitting the claims against [the nonsignatory] to go forward in federal court while the same claims against the [arbitrating parties] proceed in arbitration would require the [arbitrating parties] to defend identical claims in two separate forums.  It also would give rise to the possibility of inconsistent results." *Id*. at 885; *see also Hofer, Inc. v. Fidelity and Deposit Co. of Md.*, No. 4:13cv449, 2014 WL 644598, at *2 (N.D. Fla. Feb. 16, 2014) (granting stay of claims against nonsignatory because "the dispositive issue on [Plaintiff]'s claims against Fidelity is . . . precisely the issue in the ongoing arbitration proceeding.").

The same logic requires granting a stay here.  Try as it may to convince the Court that "the Distribution Agreement has nothing to do with Quash[,]" Resp. at 13, Quash cannot escape the fact that all of its claims turn on an interpretation of Pepsi's rights under the Distribution Agreement—a task that Pepsi and VPX have delegated to the arbitration panel.  As Quash admits, "under the Distribution Agreement, PepsiCo's distribution rights only apply to 'Licensed Products.'" *Id*. (citing Distribution Agreement § 1.1).  And the arbitration panel has made clear that "[t]he Phase 1 hearing will result in a final partial award addressing . . . [w]hether the Bang Mixx hard seltzer product is a *Licensed Product* under the Distribution Agreement." Def.'s Notice of Supp. Auth. at 1 (emphasis added).  If MIXX is a "Licensed Product," then Pepsi has the right to its distribution, and both of Quash's claims must fail, as Pepsi could not have tortiously interfered with Quash's expected business relationships with distributors and retailers for MIXX,[2]

---

[2] Under both New York and Florida law—the two states' laws possibly applicable to Quash's tortious interference claim—such a claim may only be brought where a plaintiff "*unjustifiably* interfered with the relationship" or "*improperly* procured the breach of the contract." *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1238 (S.D. Fla. 2015) ("The elements of a claim for tortious interference with a business relationship are, for present purposes, the same under Florida [and] New York . . . law.") (quoting *Williams v. Wells Fargo Bank N.A.*, No. 11-21233, 2011 WL 4368980, at *12 (S.D. Fla. Sept. 19, 2011) and *Johnson*

nor would Quash be entitled to a declaratory judgment that Pepsi has "no right to distribute MIXX." First Am. Compl. ¶ 43. Thus, as in *Hofer*, the dispositive issue in this suit is "precisely the issue in the ongoing arbitration proceeding." 2014 WL 644598, at *2. Because "the arbitrator's findings . . . will be central to" Quash's claims, "[s]taying this action while the underlying issues are resolved in arbitration will aid judicial economy and prevent the risk of inconsistent results." *Wilson v. Trans Union, LLC*, No.: 6:18-cv-257-Orl-28KRS, 2018 WL 3650080, at *2 (M.D. Fla. June 20, 2018), *report and recommendation adopted*, 2018 WL 3649637 (M.D. Fla. July 9, 2018).

Quash contends that it would not be bound by the decision of the arbitration panel, pointing to section 9.11(b) of the Distribution Agreement, which provides that "the decision of the arbitration panel will have no collateral estoppel effect with respect to a claim by or against any Person or business entity who is not a party to the arbitration." Thus, Quash argues, staying this case pending arbitration would only cause unnecessary delay. Resp. at 13. But even if Quash is not bound by the arbitrator's decision, proceeding in this litigation alongside the arbitration would lead to the possibility of inconsistent results and confusion in the marketplace. *See Postel Indus.*, 2013 WL 1881560, at *6 ("Even if the parties are not bound by the entirety of the Arbitrators' decision[,] litigating the issues here before the arbitration could readily create inconsistent results with the instant litigation, or at very least, create confusion on the issue.").

For example, if this Court were to rule that Pepsi has the right to distribute MIXX—only for the arbitration panel to rule that VPX has that right—neither party would be able to confidently

---

*& Johnson v. The Am. Nat. Red Cross*, 552 F. Supp. 2d 434, 449 (S.D.N.Y. 2008)) (emphases added); *see also Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC*, No. 07 Civ. 7998, 2008 WL 1710910, at *3 (S.D.N.Y. Apr. 10, 2008) ("The 'improperly' and 'without justification' elements of tortious interference with contract are indistinguishable in the case law, and courts . . . use the terms interchangeably."). Obviously, if Pepsi has the right to distribute MIXX, it could not unjustifiably or improperly interfere with Quash's business relationships regarding MIXX's distribution.

represent itself to the marketplace as the rightful distributor of MIXX without assuring additional litigation.  At the very least, permitting this case to further unfold would significantly degrade Pepsi and VPX's right to a meaningful arbitration and cause the parties to incur unnecessary expenses by litigating an identical issue in two proceedings.  *U.S. ex rel Postel Erection Grp.*, 2012 WL 2505674, at *2 (granting stay where "[n]ot only would there be the possibility of inconsistent outcomes, but also the parties would incur unnecessary expenses.  Staying Plaintiff's claim in this action ensures that a decision in either proceeding will not impact the outcome of the other.").

Conversely, staying this case makes sense because VPX—Quash's admitted partner in its MIXX venture—will indisputably be bound by the arbitration of these issues.  Notwithstanding Quash's assurances that it observes all necessary corporate formalities to maintain a separate existence from VPX, no one can doubt that VPX is quarterbacking the launch of MIXX into the market.  Quash "has relied upon VPX's skilled sales team to identify suitable distributors for MIXX throughout the United States."  First Am. Compl. ¶ 16.  In fact, VPX's Executive Vice President of Sales submitted a sworn declaration in the VPX Litigation stating that "VPX, on behalf of Quash Seltzer, is actively engaged in efforts to introduce MIXX" into the market, and accusing Pepsi of thwarting "VPX's efforts to execute its distribution plan" and "business strategy for MIXX."  Decl. of Gene Bukovi in Supp. of Pl.'s Mot. for Prelim. Inj. [ECF No. 57-1] ¶¶ 3, 7, 12, VPX Litigation.  Mr. Bukovi complained that prospective business partners are balking at partnership opportunities because of Pepsi's actions, and "[w]ithout these distributors, VPX is bereft of any meaningful opportunity to introduce MIXX into the marketplace."  *Id*. ¶ 13.[3]

---

[3] Indeed, as Pepsi points out, Quash makes the same allegations in this lawsuit, almost verbatim, as those made in the VPX Litigation by Mr. Bukovi.  *Compare, e.g.*, First Am. Compl. ¶ 16 ("Quash has worked diligently to develop a distribution network"); *id*. ¶ 17 ("Quash is presently working with distributor candidates"); *id*. ¶ 19 ("Quash's efforts to execute its distribution plan" have been "thwarted by ongoing and improper interference from PepsiCo"), *with* Decl. of Gene Bukovi in Support of Pl.'s Mot. for Prelim. Inj. [ECF No. 57-1] ¶ 4, VPX Litigation ("VPX has worked diligently to develop a distribution network");

Moreover, Jack Owoc, the CEO of both Quash and VPX, discussed the launch of MIXX (as well as this lawsuit) on Instagram and made no distinction between Quash and VPX. *See* Jack Owoc (@bangenergy.ceo), INSTAGRAM (Feb. 4, 2021, https://www.instagram.com/tv/CK43i_MDP4U/?igshid=1iz6kfofiuck8). In fact, he filmed himself purportedly signing contracts related to MIXX on behalf of both Quash *and* VPX. *Id*. at 2:59.

Ultimately, VPX and Quash are—if not one and the same—at least working in concert to effectuate the distribution of MIXX. When there are credible allegations of interdependent and concerted misconduct between a nonsignatory and a signatory, and when the claims are based on the same facts and are inherently inseparable as those delegated to arbitration, the better course is to stay the claims involving the nonsignatory. *See, e.g.*, *SBMH Grp. DMCC v. Noadiam USA, LLC*, 297 F. Supp. 3d 1321, 1328 (S.D. Fla. 2017); *cf. Branch v. Ottinger*, 477 F. App'x 718, 721-22 (11th Cir. 2012) (affirming the denial of a stay pending arbitration where the claims against the nonsignatory "arose out of [defendant]'s individual actions and were therefore independent of the claims against the other defendants.").

Although Quash may not be legally bound by the Distribution Agreement, Quash's rights are clearly intertwined with those of VPX—which will be conclusively determined in arbitration. If the arbitration panel determines that Pepsi has the exclusive right to distribute MIXX, then VPX does not have the right to distribute it through other entities, including Quash. In the meantime, VPX cannot shirk its contractual commitment to arbitration by authorizing a commonly owned affiliate to do what the arbitration panel might ultimately forbid it from doing itself. This is especially true in light of the Emergency Arbitrator's interim ruling in Pepsi's favor. *See* Interim Arbitration Order at 9 (holding that Pepsi is "likely entitled to the relief that is seeks in this

---

*id*. ¶ 5 ("VPX is presently working with distributor candidates"); *id*. ¶ 7 ("VPX's efforts to execute its distribution plan" have been "thwarted by ongoing and improper interference from PepsiCo").

Arbitration, namely, a declaration that [Pepsi] remains [VPX's] exclusive distributor pursuant to the [Agreement] through October 24, 2023." ).

Quash makes two final arguments in opposition to a stay, neither of which carries the day. First, Quash argues that "[i]t would be manifestly unfair, and would further exacerbate the irreparable injury to Quash, if the Court were to stay this action pending an arbitration where . . . PepsiCo only sought to add the claims [relating to Quash and MIXX to its arbitration demand] after this action was filed." Resp. at 18. But the Distribution Agreement leaves the issue of arbitrability for the arbitrator and not the Court.

VPX and Pepsi agreed that "[a]ny dispute between the Parties arising out of or relating to this Agreement . . . will be settled by arbitration before the American Arbitration Association ('AAA') under its Commercial Arbitration Rules." Distribution Agreement § 9.11(b). AAA Rule 7(a), in turn, provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Am. Arb. Ass'n, Commercial Arbitration Rules, https://adr.org/sites/default/files/Commercial%20Rules.pdf.  The Eleventh Circuit has explained that by incorporating the AAA rules into an arbitration agreement, the parties evidence a clear and unmistakable intent for the arbitrator to decide issues of arbitrability. *Terminix Int'l Co. v. Palmer Ranch Ltd.*, 432 F.3d 1327, 1332-33 (11th Cir. 2005); *see also Contec Corp. v. Remote Solution, Co.*, 398 F.3d 205, 208 (2d Cir. 2005) ("[W]hen . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."); *Morrell & Co. v. Lehr Constr. Corp.*, 287 A.D.2d 257, 257-58 (N.Y. App. Div. 1st Dep't 2001) (holding the same under New York law).  The arbitration panel has ruled that the question of whether MIXX is a Licensed Product under the Distribution Agreement

is properly presented before the panel, *see* Def.'s Notice of Supp. Auth. [ECF No. 35-1] at 2, and the Court may not disturb that decision.[4]

Quash believes it dispositive that it "filed first and the Court has the tools to resolve this issue well before the Arbitration panel holds a hearing in the arbitration[.]" Resp. at 1. Arbitration agreements would not mean much if they could be undone by having a related entity race to the courthouse, which is perhaps why courts do not hesitate to stay litigation involving nonsignatories pending arbitration even if the lawsuit was filed first. *See, e.g.*, *Hofer*, 2014 WL 644598, at *1 (a case relied on by Quash). And just as "a party should not be permitted to avoid arbitration by suing a related nonsignatory with the hope that the claim will be adjudicated first and have preclusive effect on the arbitration[,]" neither should such avoidance be accomplished by having a related nonsignatory do the suing. *Axa Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1330, 1347 (S.D. Fla. 2009) (quotation and citation omitted).

Finally, Quash argues that a stay will cause irreparable harm by delaying its ability to execute a nationwide launch of MIXX into an emerging market. *See* Resp. at 10. As true as this may be, "[t]he answer is that [Pepsi] agreed to arbitrate with [VPX], the principal adversary on the dispute . . ., and [VPX's] agreement to arbitrate brings with it the disadvantages, as well as the perceived advantages, of arbitration." *Hofer*, 2014 WL 644598, at *2. While Quash did not agree to arbitrate with Pepsi, its actions relating to MIXX are inexorably intertwined with those of VPX. Consequently, the resolution of Quash's dispute should await resolution of the underlying dispute between Pepsi and VPX—"a dispute that, for better or worse, [VPX] agreed to resolve through arbitration." *Id.*; *see also OTR Wheel Eng'g*, 2018 WL 8997490, at *5 ("[A]ny inefficiency . . . is

---

[4] Once again, Quash takes issue with the fact that it is not a party to the Distribution Agreement and therefore did not agree to be bound by AAA rules. Resp. at 13. But the point is that Pepsi and VPX came to such an agreement, and as explained above, the fact that Quash was not a party to the Distribution Agreement does not alter the fact that the dispositive issue is properly before the arbitration panel.

a consequence of the Operating Agreement, not the result of a stay. The Operating Agreement entitles [the signatory] to demand arbitration of these questions, . . . The Court therefore is not free to deny [the signatory] its chosen strategy, whether efficient or not, and the greater waste of time in these circumstances would be to plunge forward with Plaintiffs' [] claims. The Court will stay those claims pending the outcome of [the signatory]'s arbitration proceedings."). Pepsi and VPX agreed to arbitration, and a stay safeguards that agreement.

## CONCLUSION

For the foregoing reasons, the Court will stay this case pending the outcome of the arbitration proceeding between Defendant Pepsi and non-party VPX. Mindful of the Eleventh Circuit's admonition that stays of an indefinite nature are "immoderate," *Ortega Trujillo*, 221 F.3d at 1264, the Court shall fashion the instant stay within reasonable limits. Accordingly, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Stay [ECF Nos. 12 and 17-1] is **GRANTED**.

2. All further proceedings in this action are hereby **STAYED** for a duration of **one year** from the date of this Order or until a decision is issued by the arbitration panel in *PepsiCo, Inc. v. Vital Pharmaceuticals, Inc.*, American Arbitration Association No. 01-20-0015-8060, whichever is sooner.

3. Within **14 days** of a decision from the arbitration panel, or **sixty (60) days** prior to the expiration of such stay at the conclusion of one year, whichever is sooner, the parties shall file a joint status report regarding American Arbitration Association No. 01-20-0015-8060 and submit memoranda as to their respective positions on whether any further stay should issue. At that point, the Court will consider the parties' submissions and reassess the propriety of any further stay by written order. *Cf. Ortega Trujillo*, 221 F.3d at 1264 n.3 (holding a stay remaining in effect until the resolution of related proceedings indefinite in scope, despite the district court's requirement of

status reports every three months, because the district court would not be guaranteed to reassess the propriety of the stay and could instead ignore the reports and leave the stay in effect).

   4.  The Clerk is **DIRECTED** to administratively **CLOSE** this case and any pending motions are **DENIED AS MOOT**.

   **DONE AND ORDERED** in Fort Lauderdale, Florida, this 17th day of May, 2021.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**